**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0558-14T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

K.F. and R.G.[1],

    Defendants,

and

D.M.,

    Defendant-Appellant.

_____

IN THE MATTER OF A.M. and N.G.,

    minors.

_____

APPROVED FOR PUBLICATION

February 9, 2016

APPELLATE DIVISION

Argued December 2, 2015 — Decided February 9, 2016

Before Judges Alvarez, Haas, and Manahan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-256-14.

_____

[1]In its amended complaint the Division of Child Protection and Permanency sought custody, care, and supervision of N.G., A.M.'s older half-sister and K.F.'s daughter.  The amended complaint added N.G.'s father, R.G., as a party to the litigation.  This appeal pertains only to D.M., A.M.'s father.

Lora B. Glick, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ms. Glick, on the briefs).

Jessica M. Steinglass, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Kenneth M. Cabot, Deputy Attorney General, on the brief).

James J. Gross, Designated Counsel, argued the cause for the minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Mr. Gross, on the brief).

The opinion of the court was delivered by

ALVAREZ, P.J.A.D.

Defendant D.M. appeals a May 9, 2014 Family Part order finding he abused or neglected his then twenty-five-day-old infant son, A.M. His principal contention is that the judge erred by shifting the burden of persuasion to him, pursuant to the paradigm in In re D.T., at the close of plaintiff Division of Child Protection and Permanency's (Division) case. 229 N.J. Super. 509 (App. Div. 1988). We agree and reverse.

I.

When the incident at issue occurred, K.F., the child's mother, was babysitting her two-year-old nephew in the small one-bedroom basement apartment she shares with D.M. K.F. also

has a four-year-old daughter, who at the time was playing with her cousins upstairs in her grandmother's apartment.

At the fact-finding hearing, see N.J.S.A. 9:6-8.44, the Division moved into evidence the Special Response Unit (SPRU) report summarizing interviews with the parents and hospital staff. The report indicated that late in the evening of August 4, 2013, D.M. and K.F. drove A.M. to the emergency room at the nearby community hospital. They were seen in the early morning hours of August 5 by a Dr. Rocco. He "reported . . . the parents' stories to be inconsistent and felt it was concerning when the mother stated the baby fell. He stated that the father reported that a sibling made the baby fall to the floor, however, the mother stated the sibling had nothing to do with the child's falling." Neither parent speaks English and communicated with Dr. Rocco with the assistance of a Spanish-speaking hospital staff member.

Dr. Rocco's comments were not made directly to the worker, however, as he was gone by the time she arrived. His concerns were relayed to the worker by a Dr. Desiderio.

Dr. Desiderio said the father, D.M., explained "that he was in the living room and the mother was helping him to change her nephew's pamper[]" when the incident occurred. The worker noted

that Dr. Desiderio also said that the father "denied knowing how long the mother was away from the baby."

The parents directed Dr. Desiderio's attention to a bump on the baby's head that "he did not even see initially."  The baby also had a bruised upper lip.

A.M. was admitted to monitor his condition; K.F. remained with him.  The initial CAT scan of the baby's skull which prompted Division involvement revealed inconclusive irregularities.  It was possible that the baby had a fractured skull, or may have moved during the taking of the CAT scan images, or the irregularities might have been entirely normal because at twenty-five days of age, a baby's skull is not closed.  The second CAT scan taken the following morning was normal.

The observations of the primary worker who responded to the hospital were also included in the SPRU report:

> the parents['] stories were consistent with each other.  It was reported the mother left the child alone on the bed on a pillow in the room.  The mother went into the living room for [ten] minutes to help change her nephew . . . .  After she heard the baby cry she went back to the room and saw [the] baby on the floor. . . .  The mother stated she saw the bump on [the baby's] head and brought him immediately to the [h]ospital with a cab.  The father reported the same . . . .

A-0558-14T1

The mother initially reported placing A.M. in the middle of the bed.

The primary worker and the author of the report, accompanied by D.M., returned to the family home once the baby was admitted to the hospital. The condition of the small apartment was unremarkable. The worker noted a crib in the parents' bedroom "as well as ample baby supplies."

Later in the morning of August 5, the baby was medically discharged but held at the facility "waiting on 'DYFS' clearance." The discharge doctor, a third physician, suggested the worker "speak to the mother to see if she confess[es] about 'something' as her story is not plausible."

That afternoon, Division workers drove the parents to the Hudson County Prosecutor's Office to be interviewed. D.M. told investigators that sometime the evening before, K.F. was rocking the infant in the living room. In order to help him change the two-year-old nephew's diaper, she took the baby into their bedroom and placed him on top of a pillow on their bed.

D.M. said that it was a mistake to leave the child unattended, but that they did not think A.M. would fall off the bed. He told the detective that K.F. was in the living room with him for about ten minutes. When an officer commented that

A-0558-14T1

it was a long time to change a diaper, D.M. changed the time to perhaps only five to ten minutes.

The detective then asked D.M. to identify who told the doctor at the hospital that the child rolled off the bed, or that either the two-year-old or the four-year-old was around the baby when the incident occurred.[2] D.M. "denied giving anyone that information[,]" adding that the baby moves a lot but does not turn over, and that there were no children around the baby. He and K.F. were in the living room changing the two-year-old when the baby began to cry in the bedroom, and the four-year-old was upstairs.

The detective asked if the parents had spoken to the doctor separately or together, and D.M. responded that the doctor spoke to them at the same time. D.M. did not know how the baby came to fall from the bed, as they had put him on the bed before and this had not happened. D.M. reiterated that the baby's mother was feeding A.M. in the living room, the baby fell asleep, and when D.M. needed assistance, she placed the child on the bed with his head on a pillow. When asked about his source of information, D.M. said he was repeating K.F.'s explanation. K.F. in turn denied telling anyone that the baby rolled on his

---

[2] The detective's line of questioning is the first mention in the record of the child rolling off of the bed. Both parents consistently denied reporting that A.M. rolled off the bed.

own, insisting that she only said she found him on the floor when she got to the bedroom.

The Division worker returned to the hospital to interview a third physician, who agreed that the bump on the head and the bruise on the child's lip could result from the child falling from the bed. In the doctor's opinion, however, the child would have had to have been extremely close to the edge in order to fall because a child that age cannot roll.

When the worker went back to the home, she explained to the parents "that due to the doctors stating that the parent[s'] stories are not consistent as the baby is [twenty-five] days old and does not have the motor skills to wiggle from the bed to the floor, a safety plan would have to be implemented." The worker instructed K.F. not to be left unsupervised with other children. On an interim basis, once discharged, A.M. would be placed with relatives.

Further on, the SPRU report states that on August 9, the mother "admitted that she placed the infant close to the edge of the bed and reported feeling sad." K.F. was taken for a screening as a result of concerns that she was feeling suicidal.

At the end of the SPRU report, the worker stated:

> it is of concern that [D.M.] knew that the child was left alone in the bedroom, and although he did not place the child onto the bed unrestrained, he is equally responsible

for ensuring his safety and well being and failed to do so. His inaction contributed to the child's injury.

Findings
The allegations of neglect, inadequate supervision against both [the mother] and [D.M.] are substantiated as it relates to the child. . . .

The Division's expert in pediatric child abuse, Nina Agrawal, M.D., testified at the fact-finding hearing that when she saw the child on August 8, 2013, she noticed red marks on the back of the child's head. On a second examination of the baby, however, she determined that the marks were caused by the birth process as their appearance had not changed in between examinations.

By August 8, four days after the incident, the child had no visible injury to his lip and the bump had disappeared. Although Dr. Agrawal did not see photographs, she read a copy of the SPRU report. She also interviewed K.F., who acknowledged placing the child on the edge of the bed. Dr. Agrawal opined that "it's not probable or not likely that the baby fell off the bed independently[,]" even if he had been placed on the edge of the bed unless he was placed "half on half off."

Dr. Agrawal noted that the child's CAT scan was normal and a skeletal survey negative for fractures. She reiterated that in her opinion a child could not move sufficiently to fall from

the edge of the bed unless placed "half on half off." Dr. Agrawal considered it a bad practice for children to be left on a bed unattended because of the risk of sudden infant death syndrome.

When the worker who authored the SPRU response report testified, she reiterated that K.F. "clarified" that she simply did not know how the baby fell onto the floor. It was not until some days after the incident that K.F. admitted placing the baby on the edge of the bed.

At the close of the Division's presentation, the judge asked if the matter was "to be like a burden shifting case[,]" and Division counsel agreed. Counsel for the parents opposed the court's use of the D.T. burden-shifting paradigm, contending that it was inapplicable. They urged the court to not shift the burden of persuasion to the parents because the evidence as to injury were so weak. The Division had not introduced the medical records, and when the expert examined the child four days after the event, having only read the SPRU report, the child had no sign of injury.

The judge, after reiterating the facts of D.T., said he felt compelled to shift the burden to the parents because the child had an injury which no one admitted to inflicting. Since he was not "convinced that the baby had this injury because the

baby fell off the bed," and the baby was in the care of both parents, he opined that although he believed the injury "was probably some kind of accident," it was necessary to shift the burden to them.

After hearing summations, defendants having elected to present no proofs, the judge quoted N.J.S.A. 9:6-8.46(a)(2) to the effect that injuries constitute prima facie evidence of an abused or neglected child. He observed that the "D.T. cases" are "always difficult" because invariably the burden is placed "on at least one person who didn't have anything to do with the injuries to the child."

The judge credited Dr. Agrawal's testimony that the injury did not occur as a result of the child falling off the bed. Recognizing that D.M.'s only "version" of the incident was based on K.F.'s explanations, since "there was a time where dad [also] had the baby . . . in the living room[,]" he opined that he could not determine which parent caused the injury and would not "get into whether this is gross negligence versus ordinary negligence[.]" The judge applied the preponderance of the evidence standard, see N.J.S.A. 9:6-8.46(b), and stated:

> [T]his is different than D.T., but you have the same underlying factors that we -- it's just we have a limited number of people, two people with access to the child with an unexplained injury that the child could not

cause to himself, the medical explanation is -- the explanations in the plural by Mom.

I don't accept, I don't accept them, so we don't know how this injury happened. So unfortunately, the parents, I need to make a finding. And unfortunately I need to make it against both of them because I'm not convince[d] again, I don't know how this happened.

On appeal, D.M. raises the following points:

POINT I:

THE TRIAL COURT'S FINDING OF ABUSE AND NEGLECT SHOULD BE REVERSED BECAUSE IT IS BASED ON FACTUAL FINDINGS NOT SUPPORTED BY THE RECORD AND DETERMINED UNDER AN IMPROPER STANDARD SUCH THAT SUSTAINING THE TRIAL COURT'S FINDINGS WOULD RESULT IN A GRAVE INJUSTICE.

A.    The Trial Court Erred in Holding that D.T., supra, Is Applicable in this Case.

B.    The Trial Court's Ruling Was Not Based On Competent, Material and Relevant Evidence.

POINT II

THE TRIAL COURT EMPLOYED AN INCORRECT STANDARD TO FIND THAT [D.M.] ABUSED AND NEGLECTED [THE INFANT].

II.

Based on Dr. Agrawal's testimony, the judge found sufficient proof to constitute prima facie evidence of abuse or neglect, and the parents' account of the injury unconvincing. We review his decision in the context of Title 9's purpose to

protect children "who have had serious injury inflicted upon them by other than accidental means." Dep't of Children & Families, Div. of Child Prot. & Perm. v. E.D.-O., 223 N.J. 166, 177 (2015). It is well-established that determining whether a parent's action constitutes abuse or neglect requires close scrutiny of the totality of the circumstances. N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011).

Our review of a trial court's factual findings is limited. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278 (2007). We do not disturb the findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974). Additionally, because of "the family court's special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

However, "[w]here the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope

of our review." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)). The trial judge's legal conclusions, and the application of those conclusions, are subject to plenary review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

## III.

Assuming that, by virtue of Dr. Agrawal's testimony, the Division established that the parents' account of the injury was unconvincing or otherwise suspect, that factor alone does not trigger the application of D.T. The mother never admitted to being more than careless, but she never denied being the one who placed the baby on the bed. She never claimed D.M. was in any way responsible for the child's injuries. In contrast to D.T., in this case one parent took sole responsibility throughout for the incident that resulted in the injury.

D.T. created a paradigm to be applied when "[t]he state of the proofs [make] it difficult to establish by a preponderance of the evidence which of the finite group of possible abusers committed the acts of abuse." D.T., supra, 229 N.J. Super. at 515. The opinion was "mindful of" the result the Division was seeking, "not implicating custody or termination of parental rights," only "the limited protective relief for [the infant]

here sought." Id. at 516. In order for the Division to be able to fulfill its legislative charge in those rare instances, the burden would be shifted to the defendants "to come forward and give their evidence to establish non-culpability." Id. at 517. We cited to the "Child Abuse Law" then in effect, intended to provide "protection of children under [eighteen] years of age who have serious injury inflicted upon them by other than accidental means." Id. at 516 n.2 (quoting N.J.S.A. 9:6-8.8). In D.T., everyone in "the finite group of possible abusers" who had access to the child denied responsibility for the sexual abuse of the infant. Even the time the injury occurred could not be pinpointed, other than it happened within twenty-four hours of the child being examined by a physician. Id. at 512.

Moreover, although one member of the panel concurred with the continuance of "a protective order" for the benefit of the child, he dissented with regard to the burden-shifting paradigm because it "might unjustly serve to place guilt upon a parent for the heinous offense of sexual abuse merely because of the parents' inability to prove innocence." Id. at 519 (Shebell, J., concurring in part and dissenting in part). Although he agreed that an adverse inference could be drawn against a parent who neither presents evidence nor testifies, as is customary in civil cases, he could not agree with the burden shifting because

it placed a parent in the difficult position of proving a negative. Ibid.

D.T.'s burden shifting then, an aid to the trier of fact in the rare outlier case in which more than one person could have inflicted serious harm upon a child who cannot communicate, was actually fashioned to enable the Division to continue limited monitoring of a family.[3] Thus an important distinction between D.T. and this case is the result sought by the Division.[4]

In D.T. the parents had not presented evidence, which the court found was a tactic possibly chosen in reliance on an earlier appellate decision in that same case. Id. at 518. Despite this, supervision could continue until either a future hearing at which the parents "met their burden" or the "demonstration by any party to the satisfaction of the trial judge, after hearing, that [the child] is in no further danger of sexual abuse." Ibid. Another arguable distinction between D.T. and this case is that the injury was minor; however, this

---

[3] This observation has been made by others before us. Fall & Romanowski, New Jersey Family Law, Relationships Involving Children § 31:1-5 (2015) (highlighting that the D.T. court explicitly noted that it merely sought continuing supervision and not punitive relief or damages).

[4] Title 30 establishes a parallel statutory scheme permitting the provision of services to ensure a child's health and safety even absent a finding of abuse or neglect. See N.J.S.A. 30:4C-11 and 12; N.J. Dep't of Children & Families, Div. of Youth & Family Servs., 214 N.J. 8, 32 (2013).

child's extremely vulnerable young age, twenty-five days, makes any injury a cause for concern.

In any event, just because the mother's acknowledgment of responsibility was half-hearted, does not make this father guilty. Nor does the fact both parents were with the child earlier in the evening make this father responsible. From the time the parents arrived at the hospital until the mother's statement some days later that she placed the child at the edge of the bed, both parents agreed that the father had not been in the child's immediate vicinity when the incident occurred. There was no circumstance offered by way of testimony or other proof that actually contradicted the father's statement.

All the doctors were concerned because they opined the child's injury could not have occurred as the parents described. But both parents denied giving these details: that either an older sibling caused the injury, or that the baby rolled off the bed. The caseworker who authored the SPRU report agreed that the parents always denied having given those explanations.

The judge referred to the doctor's second- and third-hand version of the parents' statements as the "inconsistencies" that make the parents suspect. Regardless of whether that is a fair characterization of the record, the parents themselves were never inconsistent about D.M.'s role.

To apply the burden shifting paradigm to a case in which one parent always claimed responsibility, and no reason existed to suspect the other of involvement, is a mistake of law. The mother's story, repeated by the father, may have been questionable. But she always claimed she alone placed the baby on the bed and left him there. The parents never wavered from their assertions that the father was in another room when the child cried out.

In D.T., the facts clearly established that abuse occurred. See D.T., supra, 229 N.J. Super. at 515. In contrast, here, the judge said the injury may have been the result of "some kind of accident." The judge opined that he did not "know what happened[,]" but the possibility that the parents were not "quite forthcoming" did not trigger application of D.T. It is always possible that parents will lie when faced with the Division's intervention. More than mere speculation is necessary, however, to impose on a parent the burden of proving a negative, that the parent did nothing wrong.

The burden of persuasion should not be shifted merely because a trial judge is uncertain regarding the mechanism that caused the child's injury. Indeed, that lack of certainty was the result of the Division's lack of proof as to D.M., and should not have been resolved by application of the burden-

shifting paradigm. Even assuming that Dr. Agrawal's testimony means that the injury must have been deliberately inflicted, nothing in the record suggests that the father was the perpetrator. Nothing suggested the parent who admitted having caused the harm was lying about D.M.'s role.

As a matter of law, given these facts, D.M. should not have been required to carry any burden under D.T. The Division did not otherwise prove by a preponderance of the evidence that D.M. abused or neglected his child.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION