# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0490-18T1
                  A-0491-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.R.-R. and G.R.-R.,

      Defendants-Appellants.

_____

IN THE MATTER OF G.R.-R., JR.,

      a Minor.

_____

Submitted October 17, 2019 – Decided October 28, 2019

Before Judges Whipple, Gooden Brown, and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FN-06-0163-17.

Joseph E. Krakora, Public Defender, attorney for appellant J.R.-R. (Robyn A. Veasey, Deputy Public Defender, of counsel; Laura M. Kalik, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant G.R.-R. (Robyn A. Veasey, Deputy Public Defender, of counsel; Beth Anne Hahn, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Noel Christian Devlin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

In these consolidated appeals, defendants J.R.-R. (Jenny[1]) and G.R.-R. (George) challenge a June 5, 2018 order entered following a fact-finding trial, determining they committed abuse or neglect of their then ten-month old son, G.R.-R., Jr. (Gabriel). We affirm.

The Division of Child Protection and Permanency (Division) became involved with the family after receiving a March 29, 2017 referral from Inspira

---

[1] We use pseudonyms to protect the child's identity. R. 1:38-3(d)(12). We use a different name for G.R.R. and G.R.-R., Jr. for ease of reference, and intend no disrespect.

Medical Center. Division caseworker Doris Montalvo responded to the hospital and was informed an ambulance transported Gabriel, with his parents accompanying. The representative told Montalvo the parents were "standoffish" and answering limited questions in Spanish. They claimed Gabriel hit himself with a remote control, but the representative found their story inconsistent with the child's injuries. Gabriel was transported to A.I. Dupont Hospital (Dupont) in Wilmington, Delaware, for further testing and to undergo a spinal tap to test for meningitis.

Montalvo arrived at Dupont and met with a forensic nurse, a social worker, and two detectives. According to Montalvo, Gabriel was "sedated and intubated and lying on his back with machines helping him breathe." The detectives reported Gabriel had bruising on his face, hip, and back/shoulder area. Medical staff observed Gabriel had bruising on his neck, forehead, temple, ear, and upper eyelids. Montalvo also observed Gabriel had a scratch on his ear, "a small linear abrasion on the left side of his face," and "a linear red lesion partially hidden in the skin fold of his neck."

Speaking in Spanish, George informed Montalvo that Gabriel became sick two days prior with vomiting and a fever, but he and Jenny did not take him to the hospital because they already had a pediatric appointment on March 29.

A-0490-18T1

George denied Gabriel had any bruises and claimed he had meningitis. He repeated the claim that Jenny told him the small red spot on Gabriel's forehead was from the child hitting himself with a remote. He denied knowing the cause of the bruising on Gabriel's neck and eyelids. He stated Jenny was Gabriel's primary caretaker because he worked.

The physicians at Dupont diagnosed Gabriel with bacterial meningitis, but also suspected child abuse. Due to the extent of his injuries, Gabriel was referred to Dr. Allan DeJong, a child abuse specialist, for further evaluation.

Dr. DeJong found Gabriel's skeletal survey showed signs of a healing fracture in his right arm. He also indicated Gabriel "had significantly elevated lipase associated with fluid around the pancreas and some free intra[-]abdominal fluid " and concluded:

> This is not specific for abdominal trauma, but could be consistent with blunt abdominal trauma. [Gabriel] has external signs of trauma, most importantly of his left upper eyelid. He has a healing fracture right proximal ulna, for which no explanation was provided and no medical care was sought. He has traumatic injury to his cervical spine and upper thoracic spine with edema, ligamentous injury and epidural hematoma in the cervical region, injuries that are highly associated with abusive head trauma which would also result in intracranial hemorrhages.

Dr. DeJong suspected physical abuse caused Gabriel's injuries, not bacterial meningitis. A social worker at Dupont also contacted the Division and reported the cervical spine MRI taken of Gabriel indicated signs of shaken baby syndrome.

The court granted the Division's emergent request for care, custody, and supervision of Gabriel. The hospital discharged Gabriel approximately three weeks after his admission and the Division placed him in a non-relative resource home.

In May 2017, both parents appeared at the return hearing on the order to show cause. The court provided George a Spanish interpreter and provided Jenny a Popti[2] interpreter telephonically.

A pretrial conference was held in June 2017. Again, a telephonic Popti interpreter was provided for Jenny in conjunction with an in-courtroom Spanish interpreter. The following exchange took place:

> THE COURT: Do you understand that the state has removed your child because of safety concerns?
>
> [JENNY]: Yes.

---

[2] "Popti," a Mayan language, is spoken by nearly 90,000 people in Guatemala and Mexico. People Name: Popti of Guatemala, People Groups (Oct. 17, 2019, 12:13 PM), www.peoplegroups.org/explore/groupdetails.aspx?peid=24736.

A-0490-18T1

THE COURT: There's going to be a hearing to determine whether your child has been injured because of acts which the parents might have done.

That would indicate the child is —

[JENNY]: We take good care of our children and we give the vaccination when was needed. I think it was just unfortunately that [what] happened . . . happened.

THE COURT: All right.

[JENNY'S COUNSEL]: Your Honor, for the record, can we translate currently for my client to respond to questions at the end, but listen to everything first?

[JENNY]: I agree. Thank you.

THE COURT: All right. Thank you.

The Division interviewed Jenny in November 2017, with the assistance of a Popti interpreter. When asked if she knew why the Division became involved with her family, Jenny replied her son was sick, but was now doing really well. Jenny reported Gabriel had a light fever and vomited two days prior to when they first brought him to the hospital. She stated she did not bring her son to the hospital earlier because he was "just a little warm" and they had a previously scheduled doctor's appointment.

After Montalvo advised Jenny her son was diagnosed with shaken baby syndrome, she stated "she [did] not understand how her son got harmed when

6

no one hurt him." When asked if there was a possibility another adult or child had harmed Gabriel, she responded it "could not have happened [because Gabriel] was always with her." She denied that she or George had ever hit Gabriel or played rough with him to the point of causing injury.

Montalvo interviewed George again. He reiterated neither he nor Jenny ever harmed Gabriel. He also stated only he and Jenny cared for Gabriel. When Montalvo interviewed the parents together they professed being confused regarding the source and cause of Gabriel's injuries. Montalvo concluded the interview by asking both parents if they were confused or did not understand the conversation, and both said no.

At the five-day fact finding trial, Montalvo, Dr. DeJong, and Dr. Joseph Piatt, an expert in pediatric neurosurgery, testified for the Division. Dr. Joseph Scheller, an expert in pediatric medicine and neurology, testified for the defense. Permanency worker Rosalyn Soler testified for the law guardian.

Montalvo testified consistently with the information presented in her investigation summary report. The trial judge found her testimony credible.

Dr. Piatt testified he was the neurosurgeon on duty when Gabriel was transferred to Dupont and managed the child's head injury until he recovered. He stated "there was no question" Gabriel had meningitis, but the child also had

A-0490-18T1

a head injury and a neck injury because "brain imaging showed some spillage of blood around the outside of his brain" and records from the first hospital showed multiple hemorrhages in his right eye and a single hemorrhage in his left eye. Dr. Piatt also noted Gabriel had stretched ligaments in his neck.

Dr. Piatt could not identify the cause of Gabriel's injuries. However, he testified "meningitis generally doesn't cause hemorrhages inside the head in the subdural space, and it certainly doesn't cause neck injuries" or "bleeding around the outside of the brain." He opined the injuries Gabriel sustained in his neck could be caused by "violent movements of the head [which] can injure the ligaments, particularly of the upper neck, where the neck meets the head[.]" He stated this type of violent movement can occur in car crashes and cases of shaken baby syndrome. He further noted scattered brain hemorrhages, such as the one seen on Gabriel, are associated with shaken baby syndrome.

Dr. DeJong was qualified as an expert in pediatrics and child abuse. He stated Gabriel had external, chemical, and imaging signs of trauma, including bruising around his eye, bleeding inside his skull, ligament injuries in the neck, epidural hematoma of the upper cervical spine, a healing arm fracture, and an elevated level of lipase enzyme associated with organ leakage due to blunt abdominal trauma.

8

He opined meningitis could not cause Gabriel's retinal hemorrhages because the condition was "typically related to viral meningitis" and Gabriel had bacterial meningitis. He further noted the hemorrhages and blood surrounding Gabriel's brain were "not consistent with simple meningitis," because spinal fluid could accumulate in some cases of meningitis, but not hemorrhages in the subdural space as in Gabriel's case. He concluded Gabriel's neck injuries were "associated with violent shaking." He explained he had "not seen any other type of injury that led to that specific combination of injuries other than abusive head trauma." He also found the healing fracture in Gabriel's arm and the elevation of lipase enzyme were signs of trauma. Dr. DeJong concluded there were no benign explanations for the bleeding in the brain, the injuries to Gabriel's neck, the healing fracture in his arm, or the elevated lipase enzyme levels, and the injuries were signs of abuse, not accidental trauma.

Dr. Scheller did not examine Gabriel, but reviewed his medical records. He claimed a bruise on Gabriel's eyelid was "meaningless." When asked about the fluid between Gabriel's skull and brain, he claimed "[t]he brain look[ed] perfectly fine" and there was "no brain injury whatsoever" and attributed the presence of blood in Gabriel's skull to "rapid head growth in the . . . first ten months" after birth.

Dr. Scheller claimed there was "absolutely no evidence of any [neck] ligament injury," despite admitting "[t]here [was] some fluid . . . in some of the ligaments of the neck." He attributed the condition of Gabriel's neck to the spinal tap performed on him while he was in the hospital. He also characterized the healing fracture in Gabriel's arm as "an irritation to the bone." He provided no explanation for Gabriel's elevated lipase enzyme levels. He concluded Gabriel's physical condition was caused by meningitis and rapid head growth.

Soler testified on behalf of the law guardian. She revealed Gabriel was not Jenny's only child, and Jenny had given birth to one child in 2014, and had two other children in Guatemala. Soler testified when this information was revealed to the parents during a family team meeting, Jenny initially denied it, but eventually admitted she had three other children. The judge found Soler's testimony relevant to Jenny's credibility.

The trial judge concluded the Division's witnesses were credible. He also found Dr. Scheller "credible, but . . . [did] not give [his] expert opinion significant weight." The judge explained:

> The problem the [c]ourt has with Dr. Scheller's testimony is [that] — while he was very informative, Dr. Scheller was not necessarily speaking in terms of within a reasonable degree of scientific or medical certainty. He spoke a lot of times by using the word "can," "possibly," [or] "may." He was, essentially

10

called to try to poke holes . . . as to the ultimate conclusions that were offered by Dr. Piatt and Dr. DeJong, without necessarily offering valid and — and heavier, or weightier opinions.

. . . .

So, while the [c]ourt finds . . . the doctor was credible, the [c]ourt gives very little basis to his ultimate conclusions, and ultimately when the doctor could not adequately . . . explain away within a reasonable degree of scientific certainty as to actually what did cause the bleeding on the brain, what did cause the trauma to the head and neck area, . . . and . . . when he was asked about the [lipase], he basically said . . . — I don't know. The only thing he could talk about with that was the absence of additional external injuries, but could not address why . . . the enzyme . . . was heightened.

Based on the parties' statements to the Division, which they did not deny or rebut at trial, the judge concluded Jenny and George were Gabriel's exclusive caretakers and Jenny supervised Gabriel on the few occasions her sister came into contact with the child. Pursuant to the evidence presented, the judge stated:

[T]he bruising of the eyelids in and of themselves, do not make this child an abused and neglected child. . . .

The abrasions or scratches on his ear, the bruising and redness on the front of his ear, the abrasion or scratch . . . by his left eye, abrasion or scratch by his right eye do not, in and of themselves . . . lend to a traumatic event being inflicted on this child.

11

A child with meningitis having some fluid in — inside of his head, in and of itself, is not . . . necessarily dispositive evidence of a child going through an inflicted, traumatic event.

When we get to other areas, Dr. DeJong was very careful, once you start mixing in the blood on the brain, that is starting to suggest something more than mere meningitis, something more absent, which Dr. DeJong and Dr. Piatt were very clear, and Dr. Scheller was clear in his own way as well. There was no evidence of any type of vascular disease that this child was suffering, no evidence of any other medical issue that would explain the bleeding on the brain. Dr. DeJong was very careful to talk about the absence of other reasonable explanations.

Then you get to the enzyme in the abdomen, and Dr. DeJong stopped there and said, well, that, in and of itself, is evidence, and there's really no other explanation [other than] this child suffered a traumatic event.

The same can be said about the injuries that the [c]ourt has already found occurred to the neck, the ligament stretching, the edema, and collection of fluid. But when taken together, . . . [w]e have a constellation of issues. We have a child with meningitis who is suffering seizures, but a child with elevated and free floating fluid in his abdomen, gathered around his pancreas, enzymes — the [lipase] is heightened. The scratches or abrasions on the child's face and ear. The swelling and bruising of . . . his left eye lid. The petechial hemorrhaging — the retinal hemorrhaging I should say, the fluid on his brain, the blood on his brain. The injuries to his neck, which would have only happened from the type of impact as previously stated, that's consistent with a car accident, or a fall from a two

12

story building, all of these and this constellation is consistent with, and I do find that this is shaken baby syndrome type case. There was . . . at least an event of significant traumatic force likely, and I find it's more likely than not that this significant force involved rapid shaking of the child that would have caused all of those injuries as the telltale signs in the neck, certainly suggest, and have not been explained away by any other credible evidence, or challenged by any other credible evidence, other than Dr. Scheller's medical speculation at best.

The judge concluded:

I find that the [D]ivision, through its evidence, clearly established to this [c]ourt, certainly by a preponderance of the evidence, that the abuse [or] neglect actually occurred.

. . . .

I find that the [D]ivision is not required to . . . prove, by a preponderance of the evidence, who did what, specifically, other than it has met its burden of proof in establishing that these parents, who have elected not to come forward to testify, to rebut what the [D]ivision has established, certainly by a preponderance of the evidence, that the [c]ourt does find that both of these parents, as the sole guardians, the sole parents of this child, that they either inflicted or allowed to be inflicted these injuries.

. . . The conscious object was to inflict . . . a traumatic event on the child. That is consistent, and the [c]ourt finds, by a preponderance of the evidence, that it is a profound and aggressive and violent shaking of the child that led to these injuries.

13

. . . .

> [T]he [D]ivision merely has to prove . . . it's case by a preponderance of the evidence. The [c]ourt is convinced that it is more likely than not that both of these parents, in conjunction with one another, being the sole caretakers of this child, being the sole people entrusted with the appropriate supervision that they caused or allowed to be caused in what the [c]ourt would find to be, at the very least, gross negligence.

. . . .

> For those reasons, the [c]ourt does enter a finding of Title [Nine], abuse [or] neglect as to both defendants . . . without specificity as to who actually failed to supervise, and who actually caused the injuries[.]

## I.

"Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Moreover, appellate courts 'defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record.'" M.C. III, 201 N.J. at 342 (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). "[F]indings by the trial judge

are considered binding on appeal when supported by adequate, substantial and credible evidence." Pascale v. Pascale, 113 N.J. 20, 33 (1988) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "Although we defer to the trial court's findings of fact, especially when credibility determinations are involved, we do not defer on questions of law." N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 33 (App. Div. 2011) (citing N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88-89 (App. Div. 2006)).

## A.

On appeal, defendants argue the evidence did not support the trial judge's finding they both abused or neglected Gabriel. Jenny argues the court failed to support its finding that she failed to exercise a minimum degree of care within the meaning of Title Nine. George argues the Division failed to prove Gabriel's injuries were a result of abuse and neglect.

"Abuse and neglect actions are controlled by the standards set forth in Title Nine of the New Jersey Statutes." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 31 (2011). Regarding "the quantum of proof required in a fact-finding hearing brought under Title Nine, see N.J.S.A. 9:6-8.44, it is well established that [the Division] must prove that the child is 'abused or neglected'

15

by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" Id. at 32 (citation omitted) (quoting N.J.S.A. 9:6-8.46(b)).

The purpose of a fact-finding hearing is "to determine whether the child is [] abused or neglected[.]" N.J.S.A. 9:6-8.44. "[T]he safety of the child shall be of paramount concern[.]" N.J.S.A. 9:6-8.28(a), -8.31(a), -8.32. An "[a]bused or neglected child" includes a minor child

> whose physical, mental, or emotional condition has
> been impaired or is in imminent danger of becoming
> impaired as the result of the failure of his parent or
> guardian, as herein defined, to exercise a minimum
> degree of care . . . (b) in providing the child with proper
> supervision or guardianship, by unreasonably inflicting
> or allowing to be inflicted harm, or substantial risk
> thereof, including the infliction of excessive corporal
> punishment; or by any other acts of a similarly serious
> nature requiring the aid of the court[.]

> [N.J.S.A. 9:6-8.21(c).]

"[N]on-intentional conduct is sufficient to warrant a finding of abuse if the injury to the child is demonstrated." N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 24 (2004) (citing G.S. v. Dep't of Human Servs., 157 N.J. 161, 175-82 (1999)).

"The Division can make a prima facie case of abuse or neglect by 'proof of injuries sustained by a child or of the condition of a child of such a nature as

would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian.'" V.T., 423 N.J. Super. at 330 (quoting N.J.S.A. 9:6–8.46(a)(2)). "The evidence must demonstrate that the offered hypothesis is a rational inference, that it permits the trier[] of fact to arrive at a conclusion in a preponderance of probabilities to common experience." N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 615 (App. Div. 2010) (alteration in original) (quoting In re Estate of Reininger, 388 N.J. Super. 289, 298 (Ch. Div. 2006)).

In making a finding of abuse or neglect, a court considers "the totality of the circumstances, since '[i]n child abuse and neglect cases the elements of proof are synergistically related.'" V.T., 423 N.J. Super. at 329 (quoting N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010)).

The record establishes defendants committed abuse or neglect of Gabriel. The preponderance of the evidence proved Gabriel's injuries were not self-inflicted or the product of meningitis. There was no dispute only defendants had access to Gabriel. These conclusions are supported by the substantial, credible evidence adduced at trial.

B.

Defendants argue the trial judge erred by applying conditional res ipsa loquitor principles to find abuse or neglect. They claim the judge improperly shifted the burden to them to prove non-culpability at the fact-finding hearing.

"It is difficult to marshal direct evidence of parental abuse and neglect because of the closed environment in which the abuse most often occurs and the limited ability of the abused child to inculpate the abuser." N.J. Div. of Youth & Family Servs. v. S.S., 275 N.J. Super. 173, 179 (App. Div. 1994). However, as we noted, Title Nine permits "proof of injuries sustained by a child . . . as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian." N.J.S.A. 9:6–8.46(a)(2). We have characterized these cases as deriving from "traditional res ipsa loquitur principles," whereby the Division receives an inference of abuse or neglect necessary to establish a prima facie case, and "the burden will shift to the parents to come forward with evidence to rebut the presumption of abuse or neglect." Div. of Youth & Family Servs. v. J.L., 400 N.J. Super. 454, 470 (App. Div. 2008).

Conditional res ipsa loquitor applies when

> a limited number of persons, each having access or
> custody of a baby during the time frame when [abuse or

A-0490-18T1

neglect has] concededly occurred, no one else having such contact and the baby being then and now helpless to identify [his] abuser, . . . [t]he burden would then be shifted, and such defendants would be required to come forward and give their evidence to establish non-culpability.

[In re D.T., 229 N.J. Super. 509, 517 (App. Div. 1988) (citing Anderson v. Somberg, 67 N.J. 291, 298-99 (1975)).]

"The burden of persuasion should not be shifted merely because a trial judge is uncertain regarding the mechanism that caused the child's injury." N.J. Div. of Child Prot. & Permanency v. K.F., 444 N.J. Super. 191, 204 (App. Div. 2016). A "lack of certainty [as a] result of the Division's lack of proof . . . should not [be] resolved by application of the burden-shifting paradigm." Ibid. The burden shifts only where "the facts clearly established that abuse occurred." Ibid.

Here, there was no uncertainty as to the nature, cause, or severity of Gabriel's injuries. Because defendants were the only persons supervising Gabriel, they alone bore the burden of proving they were not culpable for the child's injuries. The trial judge did not mistakenly apply the law.

Finally, Jenny argues the judge's burden shifting, and the substantial language barrier during court proceedings, infringed on her due process rights of notice, opportunity to be heard, and ability to participate in her own defense. We already determined the burden shifting was consistent with the law. Thus, it was not a due process violation.

"Due process is 'a flexible [concept] that depends on the particular circumstances.'" H.E.S. v. J.C.S., 175 N.J. 309, 321 (2003) (alteration in original) (quoting Doe v. Poritz, 142 N.J. 1, 106 (1995)). "At a minimum, due process requires that a party in a judicial hearing receive 'notice defining the issues and an adequate opportunity to prepare and respond.'" Id. at 321-22 (quoting McKeown–Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 559 (1993)). "[T]here can be no adequate preparation where the notice does not reasonably apprise the party of the charges, or where the issues litigated at the hearing differ substantially from those outlined in the notice." Ibid. (quoting Nicoletta v. N. Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 162 (1978)).

Jenny's due process argument lacks merit. The record readily demonstrates she had the assistance of a Popti interpreter during the investigation and trial phases of the case. The Division took special care to

confirm she understood the reasons why the investigation was occurring. There is no evidence she did not understand the nature of the Division's claims or the gravity of the proceedings.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0490-18T1