# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1263-18T2
                          A-1264-18T2
                          A-1266-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

K.W., J.M., and J.R.,[1]

      Defendants-Appellants,

and

C.M.,

      Defendant.

_____

IN THE MATTER OF J.W.,

      a Minor.

_____

[1] We refer to the adult parties by initials, and to the child by a fictitious name, to protect their privacy. <u>R.</u> 1:38-3(d)(12).

_____

Argued telephonically May 20, 2020 –
Decided June 19, 2020

Before Judges Haas, Mayer and Enright.

On appeal from the Superior Court of New Jersey,
Chancery Division, Family Part, Burlington County,
Docket No. FN-03-0251-16.

Meghan K. Gulczynski, Designated Counsel, argued
the cause for appellant K.W. in A-1263-18 (Joseph E.
Krakora, Public Defender, attorney; Robyn A. Veasey,
Deputy Public Defender, of counsel; Meghan K.
Gulczynski, on the briefs).

Beth Anne Hahn, Designated Counsel, argued the cause
for appellant J.M. in A-1264-18 (Robyn A. Veasey,
Deputy Public Defender, of counsel; Joseph E.
Krakora, Public Defender, attorney; Beth Anne Hahn,
on the briefs).

John Andrew Albright, Designated Counsel, argued the
cause for appellant J.R. in A-1266-18 (Robyn A.
Veasey, Deputy Public Defender, of counsel; Joseph E.
Krakora, Public Defender, attorney; John Andrew
Albright, on the briefs).

Amy Melissa Young, Deputy Attorney General, argued
the cause for respondent (Gurbir S. Grewal, Attorney
General, attorney; Melissa H. Raksa, Assistant
Attorney General, of counsel; Amy Melissa Young, on
the brief).

Cory Hadley Cassar, Designated Counsel, argued the
cause for minor (Joseph E. Krakora, Public Defender,

2                                    A-1263-18T2

Law Guardian, attorney; Cory Hadley Cassar, on the brief).

PER CURIAM

Appellants K.W., J.M. and J.R. appeal from a March 29, 2018 order determining they abused or neglected J.W. (Jack), the son of K.W. and defendant C.M.[2] We affirm, substantially for the reasons set forth in the thorough and thoughtful oral decision rendered by Judge Louise D. Donaldson on March 29, and April 3, 2018.

We incorporate the factual findings and legal conclusions contained in Judge Donaldson's decision and add the following comments. K.W. became pregnant with Jack soon after she and C.M. started dating in February 2015. By the time Jack was born in January 2016, K.W. and J.M. were dating. Jack was born without complications and was discharged from the hospital to the care of K.W. and J.M.

Jack's first pediatrician visit occurred on January 21, 2016 and the doctor recommended he be seen by a cardiologist because Jack had a small ventricular septal defect (VSD). The next day, Jack underwent an echocardiogram at the Children's Hospital of Philadelphia (CHOP), which confirmed he had three

---

[2] C.M. is not a party to this appeal.

VSDs. CHOP's treating physician noted the VSDs should not cause Jack problems because they were "small and likely to close spontaneously." Jack had two more pediatrician visits at the end of January and the beginning of February.

On February 9, 2016, Jack spent the afternoon at the home of his grandmother, J.R. She later reported that Jack "basically slept in his swing" the entire visit, aside from one feeding, and although she changed his diaper, she did not notice bruising on Jack's abdomen. K.W. and J.M. retrieved Jack from J.R. and after the couple returned home, J.M. noticed a red mark and bruise around Jack's left eye. K.W. sent a text message to J.R., asking if she knew what happened to Jack when he was with her that day. This was the first time any of the appellants reported seeing signs of injury on Jack.

K.W. and J.M. took Jack to the pediatrician on February 10, 2016. K.W. showed the nurse practitioner some bruising on Jack's left eye and left hand and some "bruising/irritation" on the baby's torso, along with potential eczema. As Jack had lost weight from the prior visit, he was referred for testing and diagnosed with bruising and colic.

C.M. cared for Jack for a few hours at his home on February 13, 2016. C.M. visited with Jack three times previously, but this was his first time alone

with the baby. K.W. stated that nothing appeared to be out of the ordinary when she retrieved Jack from C.M.'s home.

On February 15, 2016, Jack returned to the pediatrician for his one-month well check. Jack's weight continued to decrease, he had a "very weak suck," and was "lethargic and difficult to arouse at times." The pediatrician instructed K.W. to take Jack directly to the emergency room at CHOP. K.W. complied and that same day, the Division received a referral from CHOP, due to bruises noted on Jack's upper and lower left eye and on his left cheek.

While he was at CHOP, Jack underwent a brain computerized tomography (CT) scan, which revealed an acute subdural hematoma.[3] His physicians at CHOP expressed concern that Jack had suffered "non-accidental trauma." K.W. and J.R. acknowledged K.W. was Jack's primary caretaker, but the pair did not report any trauma. They also provided doctors with a family history but denied any family history of bruising.

Additionally, on February 15, 2016, CHOP's social work department met with the family. K.W. reported she saw bruises on Jack's face the week before, but the family again denied any history of trauma to Jack. CHOP's Suspected

---

[3]  An acute subdural hematoma is a clot of blood that develops between the surface of the brain and the brain's tough outer covering, usually due to stretching and tearing of veins on the brain's surface.

Child Abuse and Neglect (SCAN) team met with K.W. and J.M. the next day. K.W. acknowledged she noticed bruising on Jack's body about two to three weeks earlier and saw bruising in the area of Jack's left eye about ten days earlier. Once again, K.W. and J.M. denied any history of trauma to Jack but offered no explanation for his bruising.

In mid-February, CHOP performed an MRI of Jack's brain and orbits. The results were "highly suspicious" for non-accidental trauma. Later that month, Jack was discharged from CHOP, a Dodd removal[4] was effectuated, and Jack was placed in the care of C.M.'s paternal aunt. On March 1, 2016, the Division filed a verified complaint for custody of Jack, alleging he was abused and/or neglected while in the care of either K.W., C.M. or J.M.

In late March 2016, the trial court heard J.R.'s custody application for Jack. C.M. opposed this application, stating J.R. could not be ruled out as the cause of Jack's injuries. The Law Guardian and Division also opposed J.R.'s bid for custody, based on her history of domestic violence and history with the Division. At the custody hearing, J.R. testified she was involved with K.W. and

---

[4] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

6

Jack "the whole time [K.W.] was pregnant," had "gone to every doctor's appointment," and took care of Jack "five days a week." The trial court denied J.R.'s request for custody without prejudice and directed that Jack remain in the Division's custody.

The Title Nine hearing began on May 1, 2017 and continued intermittently until September 19, 2017. The Division's Special Response Unit worker Cymanthia Smith, as well as intake worker Lori Davis and Dr. Michelle Lambert, testified as fact witnesses for the Division. The Division also presented expert testimony from Drs. Carla Parkin-Joseph, Tamara Feygin, and Laura Conlin. The Law Guardian called K.W., J.M. and J.R. to testify. Each appellant also provided medical expert testimony. Dr. Joseph Scheller testified for K.W.; Dr. Zhongxue Hua provided testimony for J.M.; and Dr. Robert Stratton testified for J.R.

Davis confirmed there were no reports of Jack's bruising before February 9, 2016 and that K.W., J.M. and J.R. were the infant's primary caregivers for the first twenty-eight days of his life. Based on Jack's MRIs, Dr. Feygin concluded Jack suffered from subdural hematomas and opined his "brain was hit against the skull." She rejected the notion that Jack's injuries were related to birth trauma and testified there was "no question" Jack's MRIs showed traumatic

hemorrhage. She concluded that "it was some degree of shaking the brain" that "cause[d] [the] subdural hematoma," rather than "a slight bump on the head."

Dr. Parkin-Joseph, a member of CHOP's SCAN team, confirmed Jack was four weeks old when the team had its first contact with him. After reviewing Jack's medical records, including records regarding his genetic abnormalities, she was satisfied these abnormalities did not explain Jack's facial bruising. Further, she determined his February 2016 subdural hematomas were not related to the birthing process. She also ruled out possible medical causes for Jack's injuries, including bleeding disorders, birth or prenatal trauma. Instead, she concluded Jack suffered non-accidental trauma in the form of "physical abuse." While Dr. Parkin-Joseph acknowledged Jack's facial bruising and brain injuries could have resulted from the same incident, she opined his history of bruising resulted from multiple injurious events.

Dr. Lambert, a pediatric hematologist at CHOP, testified that Jack exhibited "no evidence of [a] significant bleeding disorder" and that "none of the[] laboratory studies would explain the bleeding in his head."

When the Division's case in chief ended, it moved to shift the burden of persuasion to the defendants, consistent with the doctrine of conditional res ipsa loquitur. See In re D.T., 229 N.J. Super. 509 (App. Div. 1988). Judge

Donaldson granted the Division's application, finding its witnesses established a prima facie case of abuse and provided consistent timeframes for Jack's injuries, as well as proof that a limited number of people had access to Jack when he was injured. The judge also found this finite group of caretakers failed to identify who was responsible for the baby's injuries.

With the burden of persuasion shifted, the Law Guardian called defendants to testify. They acknowledged they cared for Jack at various times, but each denied harming Jack or knowing how his injuries occurred.

Dr. Hua testified on J.M.'s behalf, but he could not rule out non-accidental trauma as the cause of Jack's injuries. Nor was he able to identify a precise timeframe for the injuries. He also could not state conclusively that Jack's subdural hematoma and facial bruising were the result of a genetic condition. When questioned about color photographs of Jack's eye, Dr. Hua agreed the images depicted bruises, rather than eczema. The doctor speculated that Jack's subdural hematoma resulted from birth trauma, but he agreed most birth-related subdural hematomas resolve by one to three months of age.

Dr. Stratton testified for J.R., over the objections of the Law Guardian and the Division. He opined it was unlikely Jack was abused since certain indicia of abuse, such as fractures, inconsistent stories or a delay in treatment were not

present in his case. Dr. Stratton also broadly suggested Jack's genetic abnormalities could have caused his injuries.

Finally, Dr. Scheller testified for K.W. He opined Jack did not have the "hallmarks" of an abused child, as Jack had not experienced a retinal hemorrhage. He could not explain Jack's lack of bruising since February 15, 2016 but claimed Jack's chronic hematoma was actually a "fluid collection" because "it turns out that infants just get fluid in that space without ever having been injured."

After the defense rested, the Division called Dr. Conlin, CHOP's Director of the Division of Genetic Diagnostics, as a rebuttal witness. Dr. Conlin participated in some testing of Jack and could not rule out that his brain bleeds or excessive bruising were related to his chromosomal abnormality, as there was no evidence for or against such a conclusion.

Following an extensive review of the testimonial and documentary evidence, Judge Donaldson concluded C.M. was the only named defendant who proved he did not have access to Jack during the limited period when the child was injured. On the other hand, the judge concluded none of the appellants who had access to Jack during this same period "provided the [c]ourt with an explanation of how . . . the injuries to the child occurred non-accidentally or as

a result of the genetic abnormalities." Accordingly, after crediting the Division's witnesses over the testimony of appellants and their experts, she found Jack was an abused child pursuant to N.J.S.A. 9:6-8.21(c) and that appellants were "responsible for the injuries to the child." Judge Donaldson also determined that while K.W. was the baby's primary caregiver, J.M. and J.R. were Jack's guardians, as defined by N.J.S.A. 9:6-8.21(a).

On appeal, appellants contend the trial court improperly shifted the burden of persuasion to them and found Jack was abused. J.R. also argues the Family Part lacked jurisdiction over her as she was not Jack's parent or guardian. We are not persuaded by these arguments.

Our review of a family court's decision is limited. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citation omitted). Particular deference should be given to a trial judge's credibility determinations and to "the family courts' special jurisdiction and expertise." Id. at 413. Unless the trial judge's factual findings are "so wide of the mark that a mistake must have been made," they should not be disturbed, even if the reviewing court

would not have made the same decision. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citation omitted).

"Abuse and neglect actions are controlled by the standards set forth in Title Nine of the New Jersey Statutes." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 31 (2011) (citation omitted). An "[a]bused or neglected child" is defined as one under the age of eighteen

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his [or her] parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof.
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

A parent or guardian is defined by statute as "any natural parent, adoptive parent, resource family parent, stepparent, paramour of a parent, or any person, who has assumed responsibility for the care, custody, or control of a child or upon whom there is a legal duty for such care." N.J.S.A. 9:6-21(a).

Tethered to these standards, we are satisfied there was ample competent evidence to support Judge Donaldson's finding of abuse and that she correctly relied on D.T. to shift the burden of persuasion to appellants. 229 N.J. Super. 509.

In D.T., the court concluded that the conditional res ipsa loquitor standard, elucidated in Anderson v. Somberg, 67 N.J. 291 (1975), was appropriately employed when a prima facie case of abuse was established and a limited number of people had access to the child during the timeframe when abuse occurred. N.J. Div. of Child. Prot. & Permanency v. K.G., 445 N.J. Super. 324, 342 (App. Div. 2016); see Div. of Youth & Fam. Servs. v. J.L., 400 N.J. Super. 454, 469 (App. Div. 2008). Yet, if a child is exposed to a number of unidentified persons during the timeframe of abuse, or the time is unknown, traditional principles of res ipsa loquitor apply instead, and the burden remains on the Division. Id. at 470. Similarly, conditional res ipsa loquitor is not appropriate when a single actor has maintained responsibility for the child's injury. N.J. Div. of Child Protection and Permanency v. K.F., 444 N.J. Super. 191, 203 (App. Div. 2016).

Here, Jack's injuries occurred in the first month of his life, when he was not mobile and could not have injured himself. According to the credible testimony of the Division's witnesses, Jack's injuries were not caused accidentally or triggered by genetic abnormalities. Further, the Division's witnesses confirmed there was a limited time period when Jack was abused and only a few individuals who had access to him during this timeframe. Indeed,

the Division's experts testified that Jack's acute hematoma occurred within hours to three days prior to its detection, and his chronic hematoma occurred ten or more days prior to its discovery. No bruising or injuries were reported before February 9 or after February 16, 2016. Further, other than a finite period on February 13, 2016 when C.M. cared for Jack, the infant remained under the exclusive care of K.W., J.M. and J.R.

Under these circumstances, we perceive no basis to disturb Judge Donaldson's finding that the Division established a prima facie case of abuse nor do we question her corollary decision to employ the doctrine of conditional res ipsa loquitor. As appellants failed to exculpate themselves or present credible evidence to counter the Division's prima facie case of abuse after the burden of persuasion was shifted to them, we are satisfied Judge Donaldson properly found "by a preponderance of the evidence that [appellants] abused the child by causing him serious bodily injury pursuant to N.J.S.A. 9:6-8.21(c)(1) and (4)."

Lastly, we are not persuaded that the Family Part lacked jurisdiction over J.R. in this matter. During this litigation, J.R. testified that after Jack was born, she would take care of him on her days off. Her testimony confirmed she only worked three days a week. J.R. also admitted that prior to the Division's

involvement, she attended all of Jack's pediatrician appointments, except the one on February 10, 2016. Additionally, both J.M. and K.W. conceded J.R. often took care of Jack. Thus, J.R. qualified as Jack's "guardian" under the meaning of N.J.S.A. 9:6-8.21(a).

To the extent we have not addressed appellants' remaining arguments, we find they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15

A-1263-18T2A-1263-18T2