**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3746-17T4
                  A-3747-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

O.S. and L.J.,

      Defendants-Appellants.

_____

IN THE MATTER OF D.S.J.,

      a Minor.

_____

Submitted June 1, 2020 – Decided June 30, 2020

Before Judges Geiger and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket Nos. FN-09-0430-15 and FN-09-0447-15.

Joseph E. Krakora, Public Defender, attorney for appellant O.S. (Robyn A. Veasey, Deputy Public

Defender, of counsel; Sarah L. Monaghan, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant L.J. (Robyn A. Veasey, Deputy Public Defender, of counsel; Cecilia M.E. Lindenfelser, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Tara Beth LeFurge, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Rachel E. Seidman, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendants O.S.[1] (Oscar) and L.J. (Leslie) appeal from the Family Part's August 10, 2016 order finding that they abused or neglected their daughter D.S.J. (Darla) by causing numerous physical injuries while she was in their care. The primary issue on appeal relates to who, among Darla's multiple caretakers and those with relevant access to her, caused those injuries. We must also determine if the court, when resolving that issue, correctly applied the principles of res ipsa loquitur and if its factual findings were properly supported after considering all the evidence presented during the fact finding proceeding. After

---

[1] We use fictitious names for the parties and relevant witnesses throughout the opinion to maintain their confidentiality. R. 1:38-3(d)(12).

reviewing the record against the relevant legal principles, we affirm the court's res ipsa loquitur ruling but vacate the August 10, 2016 order and remand for further fact finding and clarification of the court's written opinion.

## I.

Darla was born on February 7, 2015, to Leslie and Oscar, as their first and only child. At the time of Darla's birth, the family moved into a three-bedroom apartment in West New York with their longtime friend M.E.U.A. (Emily), her paramour S.Y.S. (Stan), and Emily's children. Shortly after Darla's birth, beginning in March or April 2015, Leslie returned to work and Emily began to care for Darla during the day from approximately 8 a.m. until 4 p.m.

On or about April 30, 2015, Emily stopped caring for Darla temporarily because she was about to give birth herself. Instead Emily's sister, M.C.U. (Carla), began caring for Darla for a few days, babysitting on May 4, 2015, and May 5, 2015, and four days the following week, or approximately May 11, 2015, through May 14, 2015. Carla lived in a house with her three brothers, and babysat Darla there. Babysitter M.J.Y.J. (Jane) watched Darla on May 6, 2015. Jane lived with her husband and another woman, but they were not present when she watched Darla. Emily also admitted that she watched Darla on an unspecified day between April 30, 2015, and May 26, 2015.

Emily resumed regularly watching Darla on May 26, 2015, and continued on May 27, 2015, and May 29, 2015. On Sunday, May 31, 2015, Leslie and Oscar brought Darla to church for a blessing. Emily watched Darla on June 1, 2015. When Darla was not with one of these babysitters, her parents cared for her.

On June 2, 2015, Leslie and Oscar left for work. According to interview notes from the Division of Child Protection & Permanency (the Division), Leslie stated that Darla was "fine" at that time. Emily fed Darla at 10 a.m. and 1 p.m. and changed her diaper before putting her down to nap. Around 4 p.m., Darla became "fussy" and Emily began to feed her. Emily was feeding Darla when the child's eyes rolled back into her head and her body went limp. In response, Emily stated she "hit [Darla's] head, her back, . . . pushed on [her heart], . . . [and] gave her . . . air through her mouth" in an attempt to revive her. Emily admitted that she was "not aware of how hard she hit [Darla] at that moment" because she panicked and "didn't know what else to do with her."

Darla was taken by ambulance to Palisades Medical Center, where she experienced a seizure. She was initially diagnosed with a subdural hematoma, skull fracture, and rib fractures. While the damage to her skull was "fresh," the various rib injuries were at different stages of healing. The nurse documented a

"questionable bruise" on Darla's right hip, as well as marks on her buttocks and left shoulder, but noted no significant findings of trauma. The doctor reported that a hematoma is usually caused by head trauma or shaken baby syndrome. An orthopedic surgeon evaluated Darla and found additional injuries including a fracture of the left scapular spine, multiple rib fractures, and a corner fracture of the tibia.

Darla was transferred to Hackensack University Medical Center and remained hospitalized for ten days, where her condition was initially "critical but stable." Mark Siegel, M.D., found that Darla's injuries were indicative of "non-accidental trauma." The parents showed concern for Darla's condition and remained at her bedside, and nurses did not observe any concerns with them. In addition, Leslie and Oscar were "receptive to [the] plan of care," which required immobilization and imaging studies.

Helio Pedro, M.D., completed genetics testing on Darla, which confirmed that her injuries were not caused by an underlying bone or metabolic disease. Susan Mautone, M.D., wrote that Darla's "principal problem" was "[c]hild physical abuse." Other doctors found possible auditory and visual deficits.

Hospital staff contacted the Division with concerns for Darla's safety. The Division responded to the hospital, where both parents denied knowing what had

happened to Darla and stated that she never experienced any falls or trauma. Leslie reported that Darla sometimes cried and shook while sleeping. Leslie further reported that she called Emily around noon that day to check on Darla, because she had a "bad feeling" after having a dream that a "diabolical doll" was choking Darla.

The Division contacted Darla's pediatrician, who reported that Leslie brought Darla to the office regularly, and the pediatrician did not have any concerns about abuse or neglect. Caseworkers also visited the family's home and found it to be neat and clean, and the kitchen to be well-stocked.

On June 11, 2015, Darla was transferred to inpatient rehabilitation at Children's Specialized Hospital (CSH), where the hospital staff were unable to supervise guests such as Leslie and Oscar. Accordingly, that same day, the Division conducted an emergency removal so as to be able to control the parents' access to Darla. Leslie and Oscar were permitted to have visits with Darla at CSH, supervised by Division personnel.

Leslie agreed to questioning by the Hudson County Prosecutor's Office and denied knowing what happened to Darla. Without prompting, Leslie repeated that she and Oscar never hit or dropped Darla. She reported a past incident when Darla accidentally bumped her head on a doorframe but stated

that Darla did not cry or otherwise react to that incident. She explained that Darla was blessed by a priest on May 31, 2015 and had cried extensively that day. But, contrary to her earlier statement to the Division, Leslie said that Darla did not cry often. After providing answers to extensive questioning, Leslie invoked her right to remain silent and stated that the questions were being repeated. Leslie also began a polygraph examination with the Hudson County Prosecutor's Office but was unable to complete it because she became too emotional.[2]

Oscar similarly agreed to questioning by the Hudson County Prosecutor's Office and likewise denied knowing what happened to Darla. He also offered that they did not drop Darla. He reiterated that she had never fallen, and that he and Leslie had never injured her but that whoever caused the injuries should be given a second chance. He admitted that he used to "toss her around" when playing but stopped doing that based on Leslie's instruction.

Oscar also stated that he used to drink alcohol when living in Guatemala, but stopped drinking when Darla was born, and that Emily and Stan did not allow alcohol in their home. He denied any domestic violence with Leslie.

___

[2]   We note that no results from any polygraph examination conducted in conjunction with this case were included in the record on appeal.

During a break in the interview, Oscar sang a song, prayed, and responded to his cell phone.

At the time of his interview, doctors had only diagnosed the hematoma, scapula, and rib fractures, yet Oscar asked "[i]f they're going to be running more tests tomorrow, which could be on her leg[,] [w]hat would those show?" Oscar also completed a polygraph examination by the prosecutor's office, and again said that he did not know the source of Darla's injuries.

Emily agreed to repeated interviews by the Hudson County Prosecutor's Office and denied knowing what had happened to Darla. Emily reported that after Darla experienced the seizure, she called 9-1-1 and began giving Darla mouth-to-mouth resuscitation, shook her in the air, and hit or rubbed her on the back and head in an attempt to revive her. She explained that she never hit Darla at any other time and denied touching her in any way that might hurt her. She stated that she loves Darla and treated her as if she were her own daughter but felt resentful that Leslie and Oscar asked her to watch Darla so often, and sometimes felt desperate, nervous, and angry when Darla cried. She reported that in general, Darla cried more than most babies, but that the family was otherwise happy and that she had never observed Oscar or Leslie "play rough or

be aggressive with [Darla]." She reported that beginning around April 30, 2015, Darla did not like having her stomach touched.

Emily completed a polygraph examination on June 24, 2015. She again denied hurting Darla and emphasized that she treated her as if she were her own daughter. She denied ever shaking Darla except for her attempts to revive the child on June 2, 2015. Although she reported that Darla was generally healthy, she nonetheless later stated that Darla's eyes had rolled back into her head once before, during the week before her seizure. She had no concerns about domestic violence or substance abuse in the home, although she and Stan had asked Oscar not to drink in their home.

On June 24, 2015, Emily demonstrated to Lieutenant Honey Spirito her efforts to revive Darla. Spirito informed the Division that "[w]hen asked to demonstrate how hard she grabbed the baby by grabbing [Spirito]'s arm, . . . [Spirito] stated that [Emily] grabbed her harshly." Spirito also noted that based on her demonstration, Emily "did not support [Darla]'s head." Emily was then arrested and charged with aggravated assault, endangering the welfare of a child, and abuse, abandonment, cruelty or neglect of a child in connection with Darla's

injuries. Emily's children were removed from her care, and the Division began a separate action against Emily and Stan.[3]

Stan also agreed to an interview by the Hudson County Prosecutor's Office and similarly denied knowing what happened to Darla, explaining that he worked every day and did not help with the children. He stated that he once saw Darla trembling and crying, so he suggested that Leslie take her to the doctor. He explained that Emily stopped caring for Darla when Emily gave birth, around April 30, 2015, and resumed caring for Darla about one week before the seizure.

The Hudson County Prosecutor's Office also interviewed Emily's sister, Carla, who stated that she had cared for Darla for a few days in early May 2015, immediately after Emily had given birth to a newborn of her own. Carla stated that she did not cause any of Darla's injuries. Around May 12, 2015, she had observed a bruise on Darla's back after Darla spent a weekend with Leslie and Oscar but did not think anything of it at the time. She stated that Darla would cry when she her stomach was touched. Carla also reported that she had suggested that Leslie and Oscar take Darla to the doctor because she cried a lot

---

[3] The results of the criminal charges against Emily were not included in the record before us.

and her dirty diapers smelled bad. Carla also completed a polygraph examination for the prosecutor's office.

The Hudson County Prosecutor's Office also interviewed Jane, who babysat Darla on May 6, 2015, from 7:15 a.m. until 8:30 p.m. Leslie had provided formula and instructions on how to care for Darla and called every two hours to check on her. During this time, Jane did not observe anything unusual, though she reported that Darla cried a lot, possibly from hunger. Jane denied that any injuries occurred to Darla during their time together.

The Division filed a verified complaint and order to show cause against Leslie and Oscar for custody, care, and supervision of Darla on June 15, 2015, which the court granted and allowed the parents to have supervised visitation. The Division filed an amended verified complaint adding Carla to this litigation, because she had cared for Darla around the time of the injuries. Jane was not named as a defendant because the Division did not believe she caused the injuries.

Darla remained at CSH through July 2015 and made good progress during that time. She was released to Division custody on July 18, 2015, with referrals for physical therapy, occupational therapy, and feeding therapy and was placed in a nonrelative resource home.

On November 2, 2015, Julia DeBellis, M.D., Medical Director of the Audrey Hepburn Children's House, completed a full medical evaluation of Darla which included a physical examination and a review of medical records, and issued a report. She found that all of the fractures had a "high specificity for nonaccidental trauma" and "require[d] significant forces to be sustained." Similarly, she stated that the forces which caused Darla's injuries were "not gentle or playful in quality." She found that Darla's tibia fracture could not be dated, but her scapular spine fracture occurred "one week or less" before the seizure. The earliest injury, her left rib fractures, occurred "about 2-3 weeks" before the seizure, and the right rib fractures occurred "less than 10 days" before the seizure. Dr. DeBellis did not believe that Emily's attempts to revive Darla at the time of the seizure would have caused injury. She found no medical reasons to explain Darla's fractures but noted that forces which can cause such fractures include "the violent shaking of an infant where the extremities are flailing" and where "a caregiver grab[s] or twist[s] and forcefully yank[s] an infant's leg." She concluded that this case "reflects non-accidental trauma" and required ongoing Division involvement.

On December 19, 2015, Zhongxue Hua, M.D., Ph.D., a forensic pathologist and neuropathologist, issued a report on Leslie's behalf following

his review of Darla's medical records. Dr. Hua found that Darla's hematoma would have precluded normal feeding on June 2, 2015, contrary to Emily's assertions that Darla was healthy that day. Accordingly, Dr. Hua concluded that this injury "must have occurred under the exclusive care of babysitter [Emily] on 6/2/2015." Dr. Hua also concluded that the remainder of Darla's injuries, including her fractures "are both medically and forensically unclear in terms of exactly when, by whom, and how they occurred." However, Dr. Hua also found that the medical records "contained nothing to even remotely suggest that [Leslie] inflicted" the remaining injuries.

On January 25, 2016, the Division interviewed Oscar who denied that he abused drugs or alcohol but, contrary to his statements to prosecutors, acknowledged drinking socially and reported that he last drank alcohol about three months before. He denied tossing Darla in the air, and denied any rough play, which was similarly inconsistent with his earlier statements to prosecutors. The Division recommended that he complete a substance abuse evaluation, random urine screening, and a hair follicle test.

That same day, the Division interviewed Oscar's brother, H.S. (Howard). Howard reported that Oscar drank socially and not to excess. He stated that he once observed Oscar tickling Darla and throwing her about one foot into the air,

above her bed. Howard denied any concerns about domestic violence in the home. Howard's wife M.O. (Mary) reported to the Division that she was concerned about the parents' care of Darla. She reported that Oscar would sometimes throw Darla up in the air while he was intoxicated. She stated that he would play rough with Darla, and also perpetrated domestic violence against Leslie.

On February 28, 2016, Jack Levenbrown, M.D., a pediatric radiologist retained by Emily, issued a report following his review of Darla's medical records. He concluded that "none of the injuries date back to April 30[, 2015]." He found the tibia fracture to be of "indeterminate age." He found that the left scapular fracture occurred between May 23, 2015, and May 26, 2015. The earliest dateable injury, the left rib fractures, were sustained "between May 11 and 18" and the right rib fractures occurred between May 26, 2015, and June 2, 2015. He acknowledged that the injuries were "suspicious for abusive trauma" but that the hematoma, the right rib fractures, and the tibia fracture "may have been the accidental result of the babysitter's [Emily's] attempt to revive the infant." He concluded that the left rib fractures "most definitely predate the babysitter's [Emily's] caring for the child," which resumed on May 26, 2015.

14

The Division found substantiated cases of abuse and neglect by Leslie, Oscar, Emily, Stan, and Carla because "they all had access to and/or served as caregivers to [Darla] during the time when she sustained non-accidental injuries." The Division concluded that, based on Darla's dateable injuries, which likely occurred two to three weeks before the seizure on June 2, 2015, Jane did not inflict the injuries on Darla because she did not have access to Darla during that time.

The fact-finding hearing began on March 22, 2016 and continued over five nonconsecutive days through July 2016. The court consolidated Leslie's, Oscar's, and Carla's case with Emily's and Stan's for the fact-finding hearing.

Dr. DeBellis testified on behalf of the Division largely consistent with her written report and stated that Darla's tibia fracture could not be dated. The scapular fracture was "very rare" and occurred less than ten days before the x-ray. The earliest dateable injury, the left rib fractures, occurred two to three weeks before the June 3, 2015, x-ray (the week of May 12) and the right rib fractures occurred less than ten days before the x-ray. Darla's hematoma occurred within 24 to 48 hours of the CAT scan, which was taken on June 2, 2015, at 5:52 p.m. She again stated that Darla's injuries were from "non-accidental trauma" and were not caused by any genetic condition or genetic

15

predisposition, but that Emily's handling of Darla during the seizure could not have caused Darla's injuries.

Division intake worker Becky Mendoza testified for the Division regarding its investigation of the family and the schedule of babysitters consistent with the documentation in the record. She testified that Emily did not watch Darla from April 30, 2015, until May 26, 2015. Division supervisor Debra Cordova also testified for the Division regarding its intake of Darla and the Division's substantiation of Laura, Oscar, Emily, Carla, and Stan for physical abuse against Darla. Finally, caseworker Suzanne Marino testified with respect to Darla's resource home and caretaker.

After presenting its case, the Division moved to shift the burden of proof to Leslie, Oscar, Emily, Stan, and Carla to exculpate themselves under the doctrine of conditional res ipsa loquitur as detailed in In re D.T., 229 N.J. Super. 509 (App. Div. 1988). The Division maintained that it had proven a prima facie case of abuse and neglect of Darla, and that a limited number of people had access to and control of Darla at the time her injuries occurred. Darla's law guardian joined in the motion.

The court initially reserved decision on the motion but in light of the testimony, the court concluded as a threshold matter that the Division had not

made a prima facie case against Stan as to any of the injuries and dismissed him from the litigation. As to the hematoma, scapular fracture, and rib fractures, the court found that based on the testimony presented at that point in the proceeding, the earliest of these injuries occurred around May 13, 2015, and continued thereafter. The court found that since May 13, 2015, Leslie, Oscar, Emily, and Carla had all cared for Darla. The court noted its "serious reservations" regarding applying conditional res ipsa loquitur in the case but nevertheless concluded that because the aforementioned injuries were "caused by abuse and were not accidental," it applied the conditional res ipsa loquitur burden shifting analysis to the hematoma, scapular fracture, and rib fractures. In doing so, the court credited Dr. DeBellis's opinion concluding that these injuries occurred beginning approximately during the week of May 12, 2015, and found that because the Division established a prima facie case of physical abuse "during a time when [Darla] was under these defendants' care," defendants were required to present evidence sufficient to overcome the presumption that they abused and neglected Darla.

As to the tibia fracture, the court applied the traditional res ipsa loquitur principles set forth in N.J. Div. of Youth & Family Servs. v. J.L., 400 N.J. Super. 545, 470 (App. Div. 2008), and did not shift the burden of proof because the

experts could not estimate when that injury occurred, and the court was unable to determine which of the defendants cared for Darla at that time. Thus, the Division bore the burden of proof as to the tibia injury against Leslie, Oscar, Emily, and Carla, who could then "come forward with evidence to rebut the presumption of abuse or neglect." The court denied the Division's motion for reconsideration, and found that conditional res ipsa loquitur was inapplicable to the tibia injury because the Division failed to name Jane as a defendant when the evidence indicated that she was a caretaker during the time when this injury could have occurred.

Dr. Levenbrown testified on Emily's behalf as an expert in pediatric radiology, largely consistent with his written report. Regarding the tibia fracture, he testified that it was difficult to date, but could have occurred several weeks before the June 3, 2015 x-ray. With respect to Darla's scapular fracture, he testified that it probably occurred approximately seven days before the x-ray, or sometime after May 24, 2015. He estimated that Darla's left rib fractures occurred three weeks prior to the x-ray, or approximately May 13, 2015 through May 15, 2015. All of the fractures were suspicious for abuse, though her right rib fracture may have been related to revival attempts at the time of her seizure.

As for Darla's hematoma, he opined that it occurred less than 24 hours before June 3, 2015. None of Darla's injuries were sustained before April 30, 2015.

Dr. Hua testified as a witness on Leslie's behalf as an expert in forensic pathology, neuropathology, and anatomical pathology. He opined that Darla's "fresh injury," the hematoma, occurred on June 2, 2015. Dr. Hua explained that, because the parents did not notice any symptoms when they left for work that morning, and Darla was fed normally throughout the day, the brain injury must have occurred "very close to time before 4:00 p.m." when she had the seizure. Regarding her "non-fresh injuries," the tibia fracture could not be dated. He stated his belief that the scapular fracture occurred seven to ten days before the x-ray and that the left rib fractures likely occurred more than two weeks before the x-ray, but that the right rib fractures had no callus formation, so they likely occurred less than seven to ten days before her x-ray. Dr. Hua therefore concluded that Leslie did not cause the injuries. Oscar's counsel asked Dr. Hua two substantive questions on cross-examination, and Dr. Hua confirmed that he "pretty much" ruled out Oscar as causing the "fresh" injuries, and that there was "no evidence" that Oscar caused the non-fresh injuries.

Following trial, the court issued a written opinion finding that Leslie and Oscar abused and neglected Darla, but Emily, Stan, and Carla did not. The court

19

found that the Division had established that Darla had suffered abuse and neglect and reiterated that, as to the injuries which could be dated, the defendants were required to exculpate themselves under its earlier order adopting conditional res ipsa loquitur. The court explained, consistent with its findings on the motion to shift the burden of proof, that except for the tibia fracture, the earliest of these injuries could have occurred was "the week of May 12." Since that time, Darla "had four caretakers: her parents, [Carla], and [Emily]." The court reiterated its earlier decision that these parties would bear the burden of proof to overcome the presumption of abuse and neglect.

As a threshold matter, the court found that Dr. DeBellis and Dr. Levenbrown were more credible than Dr. Hua because it concluded that Dr. Hua's training in pathology and forensics was less persuasive than Dr. DeBellis's experience in identifying child abuse and Dr. Levenbrown's practice in pediatric radiology. The court further found that Dr. Hua's opinions were "highly speculative and unconvincing."

As to Leslie, the court found that she did not present sufficient evidence to overcome the presumption of abuse and neglect in connection with Darla's hematoma, scapula fracture, and rib fractures. The court was not persuaded by Dr. Hua's testimony that Leslie did not cause the injuries. After rejecting Dr.

Hua's opinion, the court cited statements from Carla, Emily, and Stan that Darla cried extensively at night while in the care of her parents but contrasted that with Leslie's sworn statement that Darla slept well at night. The court also cited Leslie's statement about her dream that a "diabolical doll" was in Darla's crib and found that Leslie may have harmed Darla "somehow believing that the child was surrounded by evil or was cursed." And, the court pointed to Leslie's spontaneous and unprompted statement "that neither she nor [Oscar] ever dropped the baby," as well as her invoking the right to remain silent, and the fact that "she is the only defendant who it appears did not agree to a polygraph examination." It also determined that Leslie did not provide evidence to overcome the presumption of abuse as to the hematoma, the scapular fracture, and the rib fractures, and she accordingly failed to satisfy her burden of proof. The court thus concluded that she abused and neglected Darla.

With respect to Oscar, the court found that he "did not present any evidence to overcome the presumption of abuse or neglect" in connection with Darla's hematoma, scapula fracture, and rib fractures. The court determined that he "presented no expert evidence nor did any of the expert witnesses exonerate him for causing the abuse." Further, it concluded that his statements to the prosecutors were "suspicious" because he suggested that "further x-rays of the

child would show that she had a fracture to her leg," he suggested that the perpetrator should be given "a second chance but not a third chance," and he asked "what if I've dropped her?" The court also found his conduct during the interview breaks to be "concerning" because "he sang a song about leaving and about the lie detector, he prayed, and he answered his phone." And, it determined he was "caught in [a] lie" because he initially denied that he ever drank alcohol when living in the United States, but later admitted he sometimes drank. Therefore, the court concluded that Oscar abused or neglected Darla as well.

Conversely, the court found that Carla had met her burden of establishing her non-culpability for abusing Darla. It concluded that the only injuries that could have occurred during the time that Carla cared for Darla were the left rib fractures and the tibia fracture. The court found that Carla cared for Darla on May 4, May 5, May 12, May 13, May 14, and May 15. With respect to the rib fractures, the court credited Carla's statement to prosecutors that on May 12, 2015, she noticed a bruise on the baby's back because that statement was consistent with the testimonies of Dr. DeBellis and Dr. Levenbrown as to when Darla's left rib fractures occurred. Significantly, the court found that May 12 "was right after the weekend when the parents were the sole caretakers of

22

[Darla]." And, regarding Darla's tibia injury, the court found that, consistent with Dr. Levenbrown's testimony, Carla "did not have access to [Darla] for the two weeks prior to the x-ray," which is when he concluded that injury occurred. Thus, the court found that Carla "met her burden of establishing her non-culpability for abusing [Darla]."

The court also concluded that Emily met her burden to establish non-culpability regarding abuse or neglect. It found that she "cared for the baby on May 26, 27, and 29[,] and June 1 and 2." Consistent with Dr. Levenbrown's testimony, the court concluded that Emily "was not taking care of the child" during the time Dr. Levenbrown testified that the left rib fractures occurred. Further, with regard to the left scapula fracture which Dr. DeBellis and Dr. Levenbrown both stated were "about a week old" at the time of the x-ray, the court found that Emily "had only cared for [Darla] for one day the week before the x-rays were taken." Finally, with respect to the hematoma, the court concluded that based on Dr. DeBellis's testimony that the injury occurred 24 to 48 hours prior to the CAT scan at 5:52 p.m. on June 2, 2015, the timeline "places the injury at a time after the child was picked up by [Oscar] on June 1 or . . . on Sunday[,] May 31, when the parents were the sole caretakers for the baby . . . ."

23

The court made separate findings as to Darla's undated tibia fracture. The court found that based upon Oscar's statements to the prosecutor's office inquiring if another x-ray would reveal an injury to Darla's foot, the Division met its burden of proof to show, by a preponderance of the evidence, that it was likely caused by Oscar.

The court held a compliance review hearing on August 25, 2016, and continued custody of Darla with the Division. On December 15, 2016, the court ordered the parents to comply with any recommendations for services. That same day, the Division filed an order to show cause for guardianship. On March 29, 2017, however, the court terminated the guardianship litigation and reinstated the abuse and neglect litigation. At a hearing on April 19, 2017, the Division indicated that it received psychological evaluations indicating "no clinical evidence that the parents represent a risk or threat to [Darla]'s physical or emotional integrity" and agreed with the evaluations' conclusions that "it would be in the best interest of the child . . . to be returned to her parents and [that] she has a strong attachment to her parents." Accordingly, the court ordered gradual reunification including in-home visitation with assistance from a parent mentor, noting that "the parents are not a risk to the child. They seem very committed to her."

24

On August 9, 2017, the court held a hearing and ordered unsupervised visitation for the parents. On November 15, 2017, the court approved full reunification with the parents. On March 14, 2018, the Division dismissed the litigation and this appeal followed. The Division and the Law Guardian ask that we affirm the court's abuse and neglect finding.

On appeal, Oscar raises the following arguments for our consideration:

POINT I

THE COURT IMPROPERLY APPLIED . . . <u>D.T.</u> . . . TO SHIFT THE BURDEN OF PROOF TO OSCAR AND REQUIRE HIM TO PROVE HIS NON-CULPABILITY.

POINT II

THE COURT'S FINDING THAT OSCAR ABUSED AND NEGLECTED [DARLA] IS NOT SUPPORTED BY ADEQUATE, SUBSTANTIAL AND CREDIBLE EVIDENCE BECAUSE THE EVIDENCE PRODUCED AT THE FACT FINDING NOT ONLY DID NOT PROVE THAT OSCAR INJURED [DARLA], BUT EXONERATED HIM.

A. Oscar Did Present Expert Testimony.

B. The Court's Findings Regarding Oscar are not Supported by the Record and Contain Numerous Factual Errors.

i. Concerns about whether Oscar drank are exaggerated and not supported by the record.

25

ii. Oscar was not "caught in a lie"; the court attributed a statement to him that he did not make.

iii. [Darla] did not scream in pain when with her parents.

iv. Oscar did not say that "the person" who harmed [Darla] should be given a second chance.

v. Oscar did not say that he dropped [Darla].

vi. There was likely no bruise on [Darla]'s back.

vii. Oscar's question regarding [Darla]'s leg does not prove by a preponderance of the evidence that he caused the injury to her foot.

viii. The court's ultimate conclusion regarding Oscar is not only unsupported by the record, but unsupported by substantial, credible and adequate evidence required for a finding of abuse and neglect.

POINT III

THE COURT INCORRECTLY FOUND THAT EMILY WAS EXONERATED, HOWEVER A REVIEW OF THE RECORD DEMONSTRATES THAT SUBSTANTIAL, CREDIBLE AND ADEQUATE EVIDENCE SUPPORTS THE CONCLUSION THAT IT WAS EMILY WHO HARMED [DARLA].

A. Emily Did Babysit for [Darla] During the Time That All of the Injuries were Thought to Have Happened.

B. Emily Felt Desperate, Angry and Nervous When [Darla] Would Cry, Emily Resented Oscar and Leslie, and Emily Admitted to Squeezing and Shaking [Darla].

26

Leslie raises the following similar points:

POINT I

THE COURT FAILED TO APPLY THE CORRECT
DOCTRINE OF RES IPSA LOQUITUR.

POINT II

THE COURT'S FINDING THAT LESLIE ABUSED
AND NEGLECTED [DARLA] IS NOT SUPPORTED
BY ADEQUATE, SUBSTANTIAL AND CREDIBLE
EVIDENCE.

POINT III

THE COURT'S FINDING THAT EMILY DID NOT
ABUSE AND NEGLECT [DARLA] IS NOT
SUPPORTED BY ADEQUATE, SUBSTANTIAL
AND CREDIBLE EVIDENCE.

II.

Both Leslie and Oscar allege in their respective first points that the court

erred in its burden of proof ruling. Specifically, they argue that Darla was

exposed to unidentified individuals who could have caused her injuries, such

that the court's shifting of the burden of proof under the conditional res ipsa

loquitur principles set forth in D.T. was erroneous, and traditional res ipsa

loquitur should have applied. In this regard, they argue that unlike D.T.,

conditional res ipsa loquitur was inappropriate here because there "was not a

finite set of caregivers and people with access to the baby, and [the Division] did not name all of the people with access as defendants." Defendants further contend that traditional res ipsa loquitur was appropriate because "the exact dates of the injuries were not proven." We disagree.

"Title 9 controls the adjudication of abuse and neglect cases." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citing N.J.S.A. 9:6-8.21 to -8.73). "In a fact-finding hearing (1) any determination that the child is an abused or neglected child must be based on a preponderance of the evidence and (2) only competent, material and relevant evidence may be admitted." N.J.S.A. 9:6-8.46(b). In this case, under its theory of abuse and neglect, the Division was required to prove that Darla's:

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [her] parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

"It is difficult to marshal direct evidence of parental abuse and neglect because of the closed environment in which the abuse most often occurs and the limited ability of the abused child to inculpate the abuser." N.J. Div. of Youth

28

& Family Servs. v. S.S., 275 N.J. Super. 173, 179 (App. Div. 1994). Consequently, in a fact-finding hearing under Title 9,

> proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian shall be prima facie evidence that a child of, or who is the responsibility of such person is an abused or neglected child.
>
> [N.J.S.A. 9:6-8.46(a)(2).]

We have characterized this statutory provision as deriving from "traditional res ipsa loquitur principles," whereby the Division receives an inference of abuse or neglect necessary to establish a prima facie case, and "the burden will shift to the parents to come forward with evidence to rebut the presumption of abuse or neglect." J.L., 400 N.J. Super. at 470. Under this provision, the ultimate burden of proof remains with the Division. Ibid. In this regard, "parents are not obligated to present evidence. They may choose to rest and allow the court to decide the case on the strength of the Division's evidence." Id. at 472.

We have alternatively enunciated a burden-shifting paradigm, otherwise known as conditional res ipsa loquitur, which applies when an identifiable set of individuals had custody of an infant who suffers injuries while in their care. See id. at 468-69 (citing D.T., 229 N.J. Super. at 517).

In D.T., the majority of the panel held that when

> a limited number of persons, each having access or custody of a baby during the time frame when a sexual abuse concededly occurred, no one else having such contact and the baby being then and now helpless to identify her abuser, . . . [t]he burden would then be shifted, and such defendants would be required to come forward and give their evidence to establish non-culpability.
>
> [229 N.J. Super. at 517 (citing Anderson v. Somberg, 67 N.J. 291, 298-99 (1975)); see also S.S., 275 N.J. Super. at 181 (applying D.T.'s burden-shifting paradigm).]

Under the D.T. framework, the burden of proof shifts to the caregiver to come forward with exculpatory evidence. See J.L., 400 N.J. Super. at 468-70. As noted, D.T.'s burden shifting framework applies only when the facts clearly establish the abuse occurred during a timeframe in which a defined number of individuals had access to the child. See N.J. Div. of Child Prot. & Permanency v. K.F., 444 N.J. Super. 191, 201-04 (App. Div. 2016). The burden of proof should not shift to the caregivers when one caregiver claims sole responsibility for the child's supervision during the relevant time period. Id. at 203. Nor should the burden of proof shift "merely because a trial judge is uncertain regarding the mechanism that caused the child's injury." Id. at 204.

30

Defendants rely upon J.L. for the proposition that traditional, and not conditional, res ipsa loquitur applies where there are "an unknown number of people who had access" to the child "during the period in which she was likely injured." Defendants' reliance on J.L. is misplaced.

In J.L., we elected not to apply conditional res ipsa loquitur against the child's parents. In that case, the child suffered various fractures, and where "extended family, including the two grandmothers or other relatives and friends . . . visited" and the child was "in the custody of medical personnel on various occasions and subjected to various procedures, . . . which required physical restraint," we concluded that traditional res ipsa loquitur applied. J.L., 400 N.J. Super. at 469.

Conversely, in S.S., we applied conditional res ipsa loquitur where the defendant, the child's mother, was "one of a limited number of people in control of [the child] when she was injured." 275 N.J. Super. at 181 (emphasis added). In doing so, we relied on a comparable New York provision, applying conditional res ipsa loquitur only where "the child was in the lawful custody of his parents or other persons legally responsible for his care." Id. at 181 n.2. We determined that because the child's caretakers throughout the period the injury

could have occurred were limited to her parents and her grandparents, it was appropriate to apply conditional res ipsa loquitur. Id. at 181.

Here, the court was correct to apply the doctrine of conditional res ipsa loquitur because there were a definite number of individuals who cared for Darla when her hematoma, scapula fracture, and rib fractures occurred. The evidence, including his statements to prosecutors, established that Stan did not care for Darla. The evidence, however, clearly established that Leslie, Oscar, Emily, and Carla were Darla's only caretakers during the time that the hematoma, scapula fracture, and rib fractures occurred. The expert testimony from Dr. DeBellis established that these injuries occurred beginning the week of May 12, 2015, after which time Darla was exclusively cared for by Leslie, Oscar, Emily, and Carla.

Further, contrary to defendants' position, there is no evidence that additional individuals cared for Darla when the hematoma, scapula fracture, and rib fractures occurred. Defendants' suggestion that members of Jane's or Carla's household may have been in Darla's presence is unsupported by the record. The expert testimony made clear that these injuries had not yet occurred at the time Jane watched Darla, and Jane established that no one else was present when she watched Darla in any event. While the record established that Carla lived in a

32

home with her three brothers and cared for the child there, it does not demonstrate the degree of contact, if any, these three individuals had with Darla. To this end, nothing in the record suggests that they were ever considered caregivers for Darla nor that they had unsupervised access to or control over her. And, even if any individuals may have had passing contact with Darla, the record establishes that she was under the supervision of the various named defendants when her injuries occurred. These facts are clearly distinct from J.L., wherein various unidentified medical personnel had unrestricted access to the child.

Defendants also rely on J.L. to support their proposition that conditional res ipsa loquitur cannot be applied where the injuries may have occurred "over a period of time and it is unclear as to exactly where and when the child's injuries took place." However, the application of conditional res ipsa loquitur is not precluded where the injuries occurred over an extended time period. For example, in S.S., we applied conditional res ipsa loquitur where the child's numerous injuries occurred at an uncertain time at least a "week before" they were discovered. 275 N.J. Super. at 176. Thus, while the court found that Darla's injuries occurred over a three-week period, it was not precluded from applying conditional res ipsa loquitur based on the uncertainty regarding the exact timing of Darla's injury. The court was similarly correct to apply

33

traditional res ipsa loquitur to the tibia injury, because the expert testimony established that it was not possible to determine when this injury occurred.

## III.

Defendants next argue that the court erred in finding that they abused and neglected Darla because its conclusion was not supported by the evidence in the record. In addition, they each argue that the court's findings contained numerous factual errors. And, Oscar argues that, contrary to the court's finding, he did present expert testimony. Defendants also contend that the court erred in finding that Emily did not abuse and neglect Darla. Specifically, they argue that some of the exculpatory evidence cited by the court was erroneous because: Emily babysat during the time when Darla's injuries occurred; Emily felt desperate, angry, and nervous when Darla would cry; Emily resented Oscar and Leslie for leaving Darla in her care; and Emily admitted to squeezing and shaking Darla. We agree with defendants to the extent it appears from our review of the court's written opinion that it overlooked or misinterpreted various portions of the record.

We defer to the Family Court's fact finding because of the court's "special expertise" in family matters and the court's "superior ability to gauge the credibility of the witnesses who testify before it . . . ." N.J. Div. of Youth &

Family Servs. v. F.M., 211 N.J. 420, 448 (2012); see also Cesare v. Cesare, 154 N.J. 394, 413 (1998). Although we will not disturb a trial court's fact finding "when supported by adequate, substantial, credible evidence[,]" Cesare, 154 N.J. at 412, we scrutinize more closely a "trial judge's evaluation of the underlying facts and the implications to be drawn therefrom . . . ." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007). Nevertheless, "deference will still be accorded the trial judge's findings unless it is determined that they went so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)); see also In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993). We review issues of law de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Credibility findings, however, can only be made by assessing testimony, not documents. See Barblock v. Barblock, 383 N.J. Super. 114, 122 (App. Div. 2006). Thus, although our standard of review is limited, N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008), where inadequate findings of fact are made or where issues are not addressed, we are constrained to remand for further proceedings. See Elrom v. Elrom, 439 N.J. Super. 424, 443 (App. Div. 2015).

Applying these legal principles against the aforementioned standard of review, we have identified four of the court's factual findings that appear critical to its ultimate determination that we deem require further explication by the court to determine what effect, if any, those issues had on the court's August 10, 2016 order and written decision. Findings on these matters could favor a different outcome or provide essential support for the court's abuse and neglect determination.

First, based on Dr. DeBellis's finding that the hematoma occurred 24 to 48 hours before the x-ray on June 2, 2015, at 5:52 p.m., the court stated the injury must have occurred "after the child was picked up by her father on June 1 or 48 hours before [sic] would place the injury on Sunday May 31, when the parents were the sole caretakers." This finding, however, overlooks the possibility that the injury occurred during the day on June 1, 2015, when Darla was under Emily's care. It appears that the court did not address that possibility and may have misapprehended Dr. DeBellis's timeline.

Second, the court stated that "[i]n her polygraph statement, [Emily] denied ever grabbing the baby or shaking the baby before June 2[, 2015,] when she tried to revive her." The Division's June 3, 2015 contact sheet, however, states that Emily informed the Division that she shook or "firmly grabbed or squeezed" her

"once while she was pregnant and once after having given birth." The court also failed to address Emily's statements to the polygraph examiner that she felt "desperate," "angry," and "nervous" when Darla cried.

Moreover, the court noted that Leslie was "the only defendant who it appears did not agree to a polygraph examination," but it failed to recognize that Leslie began a polygraph examination on June 3, 2015, became overwhelmed with emotion during the test, and was unable to complete it. Also, "[a]lthough there are few reported decisions involving the admissibility of polygraph evidence in a civil suit, almost all courts that have considered the question have held that the results of a polygraph test or the refusal to take a polygraph test are not admissible in evidence. Senders v. CNA Ins. Cos., 212 N.J. Super. 518, 520 (Law Div. 1986) (emphasis added). It is unclear from the court's decision what weight it placed on Leslie's failure to complete a polygraph examination, but to the extent that it relied on that refusal, its finding was not supported by admissible evidence and any reliance on Leslie's refusal was in error.

Finally, it also appears that the court misconstrued a portion of the record in support of its decision. The court found it "suspicious" that Oscar asked the detective "what if I've dropped her" during his interview. A review of Oscar's interview reveals that the court may have considered that quote out of context,

as Oscar was attempting to explain that he did not harm Darla. In this regard, he stated:

> we've never dropped her . . . . In fact, being our daughter and I'm going to tell you I haven't dropped her, and what if I've dropped her? . . . [T]he whole truth has to be said, under oath. . . . Well, I'm saying this under oath.

A full reading of Oscar's statement to the detective reveals it was part of a larger point denying any harm to Darla by reaffirming his knowledge that he was bound to testify truthfully under oath.[4]

In sum, it was incumbent upon the court to consider the totality of the evidence and circumstances surrounding Darla's injuries, in this difficult case. We are therefore constrained to remand so that the court may issue additional detailed factual findings addressing the aforementioned discrepancies and address whether its amended factual findings alter its conclusion that the

---

[4] We also note that the court determined that Oscar "presented no expert evidence nor did any of the expert witnesses exonerate him for causing the abuse." That statement is not correct. Although Oscar did not call an expert to testify on his behalf, Leslie's attorney called Dr. Hua to testify and Oscar's attorney noted that Dr. Hua "represents the parents." Dr. Hua testified that he "pretty much" ruled out Oscar as causing Darla's injuries. While we recognize the court found Dr. Hua "the least credible and persuasive of all three expert witnesses" because "[h]is experience is primarily diagnosing disease and causes of death" as compared to Dr. DeBellis's experience with child abuse and Dr. Levenbrown's as a pediatric radiologist, it was inaccurate to state that none of the experts exonerated Oscar.

A-3746-17T4

Division satisfied its burden to establish that Oscar and/or Leslie abused or neglected Darla. Nothing in our opinion should be interpreted as a forecast of the remanded proceedings. We leave the scope of those proceedings to the trial court except that all interested parties, including but not limited to Emily, should receive notice and an opportunity to participate. Accordingly, we vacate the court's August 10, 2016 order and remand the matter to the trial court for reconsideration after its review of the existing record and further findings of fact.

To the extent not addressed, defendants' remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, vacated and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3746-17T4